Marguerite S. Moore Petitioner Appellee, and Norman T. Moore Respondent of the County. Respondent of the County, Ms. Annie Rapp. Respondent of the County, Mr. Pat Levy, and Ms. Patricia Lucey. Ms. Rapp, you may proceed. Thank you. Good morning, and may it please the Court. Good morning. The Appellant, Mr. Moore, respectfully asks this Court to reverse the trial court's decision and define that Marguerite Moore was cohabitating with Christopher Dyla on a resident, continuing, and conjugal basis as defined by the statute and prior case law. Mr. Moore respectfully requests this relief for the following two reasons. First, that it is important that the intended purpose of Section 510C of the Illinois Marriage and Dissolution of Marriage Act be considered. And second, that this case provides evidence of cohabitation as intended by the legislature and the courts. Counsel, the fact that she was given a ring and may even have agreed to marry is not the equivalent of de facto marriage, though, is it? No, not in itself, Your Honor. However, oh, I'm sorry. No, I was going to ask, what else do we have here, then, that would require that result? Well, Your Honor, in this case, there was an engagement. There is no question about that. But the engagement itself is the turning point from what changes this relationship from an intimate dating relationship into a de facto marriage. As when you consider the engagement, in addition to the remaining factors that this court considers in prior case law, it rises to the level of de facto marriage. Well, don't we have to look at the nature of other activities? And they only spent some holidays together, some nights together, had intermittent contact with each other's families. So where is the rest of what would be required, then? Your Honor, the factors, the six factors include the length of the relationship, the amount of time spent together, the nature of the activities engaged in, the interrelationship of personal affairs, including finances, whether they vacation and whether they holiday together. So I was focusing on the two, the nature of the activities and the interrelationship of personal affairs. Well, when it comes to the nature of activities engaged in, there was testimony that they spent considerable time together, including most of the holidays, during their almost three-year relationship. They spent most Christmases, Thanksgivings, Fourth of July, Easters, Memorial Days, and more together. In addition, they spent time at Margarita's home where Christopher Dyla would prepare dinners, for example. He met at least some of her children. She met his parents 15 to 20 times. But he lives with his parents, so that's not unusual, is it? I mean, if they didn't live in the same house, maybe she wouldn't see him that often. When it comes to where they live, they both testify that they maintain separate residences, that Christopher lived with his mother and his father, that he makes $75,000 a year, but he doesn't pay any expenses there. The trial court in this case actually found that testimony not to be credible. But regardless of the fact, at the very least, there was testimony that he spent the night at her house twice a week. This court, in Miller, has stated that in order to find cohabitation, partners do not need to be residing in the same household. They could be living in separate households. Now that you've mentioned the gorilla in the room, Miller, Miller is a six-year relationship, not often residing together but occasionally residing together.  And the court still didn't find it was a de facto marriage. So how, at three years, and the more sparse facts in terms of their relationship, can we find that this is a de facto marriage? And if I could please add to that, an on-and-off engagement situation. Well, and as to the first point, in this case, the difference between this case and the Miller court is there was that interrelationship of their personal affairs. In the Miller court, the court pointed out that there was no such evidence. All they had was the golf membership, and that wasn't enough to rise the level of commingling of assets and interrelationship of personal affairs. However, in this case, we have two bank accounts that the couple shared. They started a joint account in March of 2015, and they started a savings account a couple months later, in which Christopher Dial was the trustee and Margarita Moore was the beneficiary. They stated that the purpose of this account was to save money, that Christopher Dial's role was to assist her to save money, so that she can hopefully build a nest, was the word she had used, and purchase a home. According to our case law, what's important when it comes to the interrelationship of personal affairs is whether the couple look to each other for financial support. Our district has found that need is not an appropriate factor to consider. Therefore, whether the new partner actually provides support or help with expenses is not actually required. Well, but financial support, maybe that's true by way of the case law, but how is this financial support, or how is this trustee position, as it's been described, and beneficiary position, how is that, how is, what is that? Let's put it, let's start there, and then how would that be relevant here? Well, and as the Miller Court pointed out, we're looking for signs of permanent and intended commitment, and a marriage-like relationship. Maybe after she buys the house, she's going to say, thank you, it's been a nice run. Possibly. Okay. So I don't know how that the trustee beneficiary is in any way indicative of their intention. Oh, I'm sorry. Because she was looking to him for support. And in marriages, a lot of the times, partners in marriage, you have one that could be a little bit more frugal, and you could have one that is a little bit more of a spin thrift. And the frugal partner is going to help that other partner save the money. And this was their intent. This is what they testified their intent was. But it would have been their money. In this case, it's just her money. Correct. But there is also evidence that he would transfer the money into their joint account from the savings account. He testified. Go ahead. He testified that the purpose was whenever she needed the money, she would simply ask him, and he would testify the funds. But regardless, he was transferring funds from that savings account to their shared joint checking account. But he never put anything in that checking account either other than her money, did he? According to his testimony, he did not. Well, was there any proof that he did? Because the issue here would have to be proved by your client.  It is your client's to prove. So what did your client prove? Did he get bank records? Did he see any transfers? Did he see any deposits? Your Honor, according to the bank records, what was demonstrated was there was two debit cards that were used for the joint account. There were two debit cards consistently used until Christopher Dyla was removed from the account July 2016. After that point, only one of the debit cards was used. And when asked about the two debit cards, Margarita Moore testified that she kept one in her purse and one in her car. Again, the trial court found this testimony not to be credible. Were they both used? Do we have evidence that they both were in fact used? Yes. According to the exhibit that was entered into evidence, it's clear that both debit cards were consistently used. It's pretty clear on the records that there's separate numbers for each debit card. Right, but the usages didn't amount to evidence that they were commingling funds in order to support a shared lifestyle, though. And that's where the courts, when they've looked at the interrelationship of personal affairs, and especially the statements made in the Miller court, it's more of whether there was a partnership approach to the use and preservation of funds. That was a statement made by this court in the Miller case. But not necessarily whether or not he assisted her in some way, which would be more in the area of need and whether or not she needed his assistance. But usually we have some evidence that there is, whether there's need or not, we have some evidence that both parties are contributing to something, to an account, to a rent, to a mortgage, to the groceries on a regular basis. Like, okay, you pay this, I'll pay this. What do we have here that looks like that? We have testimony from Christopher Dyla that he did purchase groceries when he would make dinners for Margarita Moore and I believe her family, and that he at the very least had paid a vet bill when he took an animal to the vet. He paid a bill for her. Did she pay him back? I believe she testified that she did pay him back, but there's no records to show that. Were they ever subpoenaed by your client? No, Your Honor. There is also additional testimony that they went on a vacation together to New Orleans, in which on his credit card he purchased the flight and the hotel room. There's testimony that he received reimbursement from that, but again, according to their bank records, there's no indication of a deposit of the amount he had testified to. Do you understand the burden on review as a manifest way to the evidence? I do, Your Honor. This evidence could arguably go either way, so why is it such that the half-empty glass is not half-empty, it's half-full, in your opinion? Your Honor, that goes to my point of the legislative intent. The courts have often struggled with determining what is the difference between an intimate dating relationship and what is a de facto marriage. According to our statute, we have these terminating factors for a reason. They're designed to remedy these obvious inequities. Just as it's not fair for an ex-spouse to continue paying their ex maintenance upon marriage or death, it equally is unfair to have them pay when their ex is cohabitating with another person on a resident-continuing conjugal basis. With marriage, there's the formal ceremony, there's the formal marriage license. There's no investigation as to whether or not that marriage is a real commitment or not. Here, there is a formal acknowledgment. There's a formal acknowledgment that that relationship, that that intimate dating relationship, became formalized, and that's the engagement of the parties, or of the couple. Do you accept that there may be a difference between intimacy based upon consideration and an intimate relationship based upon a relationship other than one-sided payments by one party to the other? I guess I don't follow. Justice Hutchinson was referring to a relationship where both parties are contributing, and from what I can tell, the only thing that the man was contributing was he visited her, stayed over. She, I don't think, ever stayed at his house, did she? Not at his parents' home, no. And that he acted as trustee, but he never put any money other than purchasing food for meals into the mix, except possibly an occasional payment to the veterinary. So if this thing appears, at least to me and probably to the trial court, that this is a one-sided situation where she is putting money into the relationship and he isn't. So what is he putting into the relationship that supposedly would make this a de facto marriage? Well, and that goes to the financial need aspect, Your Honor, because he's not required to actually financially help her. There's been case law, including in remarriage advice, Bruce, with this case. So if there was a divorce, she wouldn't get anything is what you're saying, correct? From her new partner? Yes, from her new partner. Well, I suppose that depends on whether he has assets or not, but yes, the need factor, the fact that whether or not he contributed to her is irrelevant when it comes to cohabitation because this court has pointed out that we're not looking under Section 510A in a modification proceeding where need is relevant. We're looking at 510C where we're really just looking for a marriage-like relationship, and a marriage-like relationship can take on various forms. But the engagement that they had, I mean, she did get a ring, but she initially accepted the proposal, then it was broken off. Supposedly at the date of the hearing they were no longer engaged, so that wasn't, they had no wedding date. As I said, they weren't even engaged. So how does that support your position? Thank you, Your Honor. So when it comes to the testimony regarding the engagement, Margarita Moore was the first to testify about the engagement, and she testified that they were engaged July 2016. The trial court even questioned her about the circumstances surrounding the engagement, and she testified to the trial court that she was first engaged July 2016. She then waffled and said they became unengaged, engaged again, unengaged, and again the trial court found this testimony and the testimony surrounding their engagement to be not credible. But the fact of the matter is that he proposed with an $8,500 ring, and she accepted the proposal. The current status of their relationship at the time of trial or even months after their initial engagement is not relevant. According to the statute, the obligation to pay maintenance is terminated when cohabitation is found. In In Remarriage of Tool, this court stated that whether or not cohabitation is currently occurring, may I continue? Yes. Okay. Whether or not cohabitation is currently occurring is not important. What's important is to look whether the party is currently cohabitating or has cohabitated in the past. The mere fact that the relationship has ended at some point during their relationship doesn't refute the evidence that the couple had cohabitated. If the current status matters, then basically any case where we had cohabitation Is marriage supposed to be a symbiotic relationship? Yes. I think that in any marriage I would say that there's give and take, but I think that's emotional and practical. How was this a symbiotic relationship? For example, regarding the bank accounts, he was helping her and assisting her to save this money. That was his role. He spent time with her family. They spent time together at the holidays where they were together and supportive together. In any relationship, there could be someone that does more than the other person. Maybe in this case, Margarita Moore was the one that was financially supporting the relationship. But in this case, there definitely is testimony that they had a marriage-like relationship when it comes to their emotional and practical factors. Thank you. Your time is up. You'll have an opportunity to make rebuttals. Ms. Gustry, is that how you pronounce it? It is, Your Honor. Good morning. May it please the Court. Good morning. As the Justices have correctly stated, there are a number of factors that this Court can consider when determining whether a de facto marriage exists. And from your reasoning in Miller, you have to look at the totality of circumstances. And as you correctly pointed out, Mr. Moore has the burden of proving that a de facto marriage exists. The trial court did not mince a whole lot of words when she found that she really didn't believe a lot of what the former Mrs. Moore and Mr. Dyla said. How do you reconcile that with then saying that there isn't some indication that they are, in fact, in a de facto relationship? Because if she doesn't believe that they were engaged, they're not engaged, which seemed to be one of her biggest problems, and then the money issue was the second problem. What is she looking at then? Sure. Well, I would start with the engagement. First, I don't know that there ever was an engagement. I don't know that the record reflects that the parties, meaning Mr. Dyla and Mrs. Moore, had a meeting of the mind such that they truly intended to be married. As Justice Zinoff pointed out, the engagement was on again, off again, and Mr. Dyla testified that it was a pseudo engagement. So I can appreciate that Judge Flood had a difficult time ferreting out what Mr. Dyla and Mrs. Moore were classifying their relationship as. However, I think that even if this Court were to say they were engaged, that's but one factor that you would consider in the totality of the circumstances. So I would agree with the Court that perhaps Mrs. Moore was not a fantastic witness, but I don't believe that that in and of itself would be something that would allow this Court to overturn Judge Flood's reasoning or to say that her findings were against the manifest weight of the evidence. More to the point of what Justice Hutchinson was getting at, when the trial court says that he did not find them to be credible witnesses, he didn't make findings of fact insofar as what he thought the facts were correct. He just made this nebulous statement, I don't believe you, but that doesn't tell me a number of things, number one of which, whether a petitioner has proven his private patient case, number two, whether because I don't believe you, whether I think that it is the engagement is presently on or that it's always been on or that it was off once or twice but now it's on again. So was there anything in the record whenever he made or she made, pardon me, these findings relating to credibility that she actually extrapolated those findings of credibility into conclusions of fact or law? My reading of her ruling does not do that, Your Honor. What she did say in her ruling, and it's something that my opponent referenced in her brief, is the fact that Judge Flood stated that she found no positive evidence to support a de facto marriage. So I think that perhaps her choice of wording might not have been exactly what she intended to say. What negative evidence did she determine that frying pans were consistently thrown? I mean, is there such a thing as negative evidence establishing a cohabitation? My understanding of my opponent's argument is that I believe she's insisting that this court insert itself into Judge Flood's seat and then make sure that Judge Flood made an inference, that she made inferences from evidence that did not exist. That's essentially what I believe Mr. Moore is asking. He's asking Judge Flood or this court to infer that because Judge Flood might not have believed that a 40-some-year-old man was living at home with his parents, that therefore that translates into a de facto marriage and they must have been cohabitating. That's based upon the case law. Miller, Sunday, Weisbrook, Landon, all of these cases support the court's finding because if this court looks at Miller and the factors set forth in the facts of that case, Miller would have been a situation where there would have been even more opportunity for this court to find cohabitation than in the case that is before you this morning in the way of the marriage of Moore. I have taken liberty some with opposing counsel's painting of the facts in this case because Ms. Moore and Mr. Dyla both testified that they spent approximately two nights per week together. I believe that that is undisputed. But the record is reflective of the fact that they had limited family interaction. I believe that the record even shows that Mr. Dyla wasn't even sure if his fiancee's brother had passed away or which brother it was. That does not lend itself to a de facto marriage. What this court has to look at is does this relationship achieve a gravitas that is akin to marital behavior? Based upon the record and the evidence that was presented in the trial court, I don't believe that the Moore relationship has that gravitas. They worked together for two years, unlike Miller where they were together for six. In Miller, they vacationed 14 times. In the case before the court today, they went on one trip to New Orleans and had two overnight weekends in Chicago. Their communication and their contact was certainly more than platonic but did not rise to the level of a marital or de facto marital relationship. Opposing counsel led with what is the intended purpose of the act. The intended purpose of the act is to make sure that someone does not continue to receive support from their former spouse while being supported by another. The word support was used often in my opponent's presentation. That, in this case, is quite a stretch. Mr. Dyla, the evidence is very clear that Mr. Dyla provided no support to Ms. Moore. And as I thought through this... Are you suggesting the legislative intent is that a divorced spouse should not be required to pay maintenance for the other spouse when that spouse is receiving some sort of financial support from a third party in a relationship that appears to be marriage? I believe that is what the statute provides for and I believe that is what the case law provides for. Was there any indication in the record that the man provided any support to Ms. Moore? Other than the potential payment of a veterinary bill, there was none. Well, what about the food? Oh, my apologies, Your Honor. He did testify that he purchased groceries to make a meatloaf. Approximately $30 at a time was spent to purchase groceries and bring them. Was this an expensive meatloaf? It was. I'm assuming there were some sides associated with it. The point is it was nominal. The testimony was that when they would go out for dinner, they split the bill. When they went on the vacation to New Orleans, she paid for 50% of it. He didn't recall or she didn't recall whether the vet bill had been reimbursed, but I can certainly argue that it would be normal for a good friend to assist someone if their pet was in distress. So if we look at whether this couple had intended permanence, the record does not reflect that there was intended permanence. The engagement is a red herring. There are many ways that someone can be in a permanent relationship without having ever been engaged. And if the court were to look at In re the marriage of Lambden, in that particular case, it's a 1993 case, so it is older, but in that case, the parties were engaged. The trial court made a finding that they were engaged, and the appellate court acknowledged that they were engaged, but went on to overturn the termination of maintenance because the court didn't find in that case that there was sufficient evidence to provide that they had, I'm using language that's today's language, de facto marriage. In that case, they did not find cohabitation. In my research, that was the only case that I could find that referenced an engagement ring. And a true engagement. And since that was not considered to be cohabitation, and I feel like the facts of Lambden are significantly more, have more gravitas than the case before this court, I don't see that there's any basis to overturn the trial court's decision. Her decision was not against the manifest weight of the evidence. Who would be in a better position to determine the credibility of the witnesses? And even though she found that perhaps Mr. Dyla and Ms. Moore were not the most credible witnesses, in total, her finding comported with this court's finding in Miller. Did she ever mention Miller in her actual decision? No, Your Honor. I don't recall specifically, but I do believe that she went through the factors, the six factors in her opinion. It was an oral ruling, not a written one. So, you know, and if the court looks at those six factors, two or three of them sort of fit into two or three other ones. They're sort of all interrelated. So, if you look at each individual factor, the length of their relationship, which was two years. In the Miller case, it was six. The amount of time they spent together was two nights per week. In Miller, they spent approximately 70% of their weeknights together. The activities engaged in, in the case before the court this morning, Ms. Moore and Mr. Dyla went on one day trip, or one five-day trip, rather, to New Orleans and had dinner a couple of nights a week. In Miller, they went on, I believe, 14 trips, many different golf trips. Interrelation of personal affairs, the bank accounts, I do want to address that. The bank accounts also are a red herring in that Mr. Dyla was placed on the account, and I believe this is significant. As the trustee and not the beneficiary. If that had been reversed, we might be having a different conversation, but if Ms. Moore intended for Mr. Dyla to benefit from the money in that account, he would have been designated as the beneficiary. So, would I necessarily entrust my money to someone in that way as a mechanism of saving? Probably not. But that is also but one factor that would not, in and of itself, terminate maintenance. Most trustee relationships that we're all familiar with are either for the very young or for the very old, so this is a rather unusual circumstance. Did the court, other than saying it was unusual, have any other specific comments about it? I don't recall that she did, except to say that she, as counsel pointed out, found it odd that there were two debit cards, but Ms. Moore testified that she kept one in her purse and one in her car, and I would point out to the court that virtually every bit of testimony provided by Ms. Moore in this case was uncontroverted. It's a very important point because in all of these other cases that this court has decided or relied upon, you had something else. You had a payor spouse who perhaps had a private investigator or had a neighbor who would come and testify that someone's car was in the driveway on many nights a week, and a Facebook post where they had a family photo and such a great family. You have none of that here. These are the most unengaged, engaged people that I have seen because they have little to no relationship. So I think that if the court considers that Judge Flood was there. Is there another purpose for that trust other than to save money? Your Honor, you're asking me to sort of insert myself into the mind of our client, and I'm not in a position to do that except to say that she had received all of the money from her divorce settlement. No money was contributed by Mr. Dila. It was 100% Ms. Moore's money. So perhaps she was concerned that she had an excessive spending problem or that she wanted to save it, but there's no evidence to suggest that she and he were saving it. There's no testimony where I think one of the justices mentioned it. Well, if he's a trustee, he's a fiduciary, and he supposedly can't spend it on himself. Sure. And so I'm having a problem trying to understand how this proves or weighs or implies or infers that there is some sort of de facto marriage. I don't know what it proves other than the fact that it was done. If I – in divorce there are cases where someone will put money or put assets from non-marital assets into another thing that then stays non-marital, and when they say we are doing this or I'm doing this for tax purposes or estate purposes, the statute actually allows things to be done for that reason. I can't understand what the function or the utility of putting this money into an account, making him the trustee and her the beneficiary, portends. So I don't know, and I don't think you have the burden to establish that it's a negative. But was there anything in the record that indicated that it was for anything other than a savings account of some sort? Not at all. Not at all, Your Honor. Okay. Any other questions? Thank you. Thank you, Your Honors. Ms. Rapp. If you can answer what conundrum I created or related, I appreciate explaining what the implications of that account is. Well, Your Honor, married couples have different types of relationships. In this case, Margarita Moore decided to have her partner, her boyfriend at the time, help her and create this savings account so that she could hopefully save enough money to build a nest to purchase a home. That was his role. It's clear from at least Miller and in Remarriage of Weisbruch that it's important to look at whether these partners look to each other for help and for support, which is what she was doing here. We can't look into the minds of these two and really see if there was any other purpose. We do know that the court found it was odd and equally found it odd that on the same month that she filed her initial petitions in this case that she withdrew approximately $23,000 from that account and it disappeared. There's odd facts here in this case, and we can't go into the minds of the couple to determine what that means. But what we do know is that there was a trustee-type relationship where he was helping her. And remember, he works at a bank, she works at a bank, so maybe he's a little bit more the frugal partner in the relationship. Then whenever she needed money, he would then transfer money to their shared joint checking account. Was this account at a bank that he was affiliated with? Yes, it was BMO Harris Bank. Both accounts were BMO Harris Bank. They both work at BMO Harris Bank. They don't work at the same bank, though. No, they're different branches. They work the same at one point. Right. Back when they met six years ago, they actually worked at the same branch court, and then they started their relationship pretty soon thereafter. But what's important here in this case is that the underlying theme in each of these cases that the Illinois courts have decided where there's cohabitation, because they're all different, they are all different, is that there's been a demonstrated deeper level of commitment and permanence. This is what this court was looking for in Miller. And here we have a couple with a lengthy relationship, at least close to three years. They shared bank accounts. They spent significant time together, meaning holidays, most of their holidays. They had vacations together. They cooked dinners together. They went on vacations together. And they were engaged, which is, according to Black's Law Dictionary, it's an intent to be married. They had an intent to be married. He purchased a fairly expensive engagement ring and gave it to her. And at the time of the trial, she was still holding on to that ring. Because he wouldn't take it back is the testimony, correct? Right. But if someone – oh, sorry. Well, so if he won't take it back but she wants to give it back, maybe he wants to be engaged, but it might look like she doesn't particularly want to be engaged. If I was given an $8,500 ring, I would simply put it in the mail and address it to my boyfriend. And if she really intended on giving it back, there's many ways that she could have dropped it off at his home or mailed it. In the mail? Yeah. It would help if he registered his certificate. Certified mail, right? But the point is, is that this is the type of case in the set of facts that the legislature intended, where there would be that intended permanence and commitment enough to rise to the level of cohabitation. So for what period of time does there have to be this intended permanence? You mentioned that they were engaged. We had talked earlier about the fact that the engagement was broken off several times at the time of the hearing. There was no intention to be married. And you indicated that even if they were engaged, period, or for the first time they were engaged, that was enough. And I don't see what authority there is for that. I mean, where do we draw the line? You have to use all of these other factors, but it seems to me you can't just look at the day that they got engaged and say they got engaged, so this is the factor. You have to look at the totality of the circumstances, even regarding the engagement, do you not? I would agree with you fully. I think it's more that the date of the engagement is perhaps the date that the cohabitation maybe began. But at that time, there was shared bank accounts. There was the time spent together and the holidays and the vacations. So it's more of a timeline of when the cohabitation perhaps would have began. So all of that, let's say, is before the hearing. We don't look at the situation on the hearing date? Well, according to In Remarriage of a Tool, and I believe the statute speaks to it itself, it doesn't matter what the current status is of the relationship. It matters whether or not the cohabitation is currently occurring right now or it has at some point in the past. There's a case that actually was fairly recent that came down in the third district, which I know is not the second district, where the relationship had ended before the time of the trial. But they had stated again in that court that it doesn't matter. It matters that the cohabitation had occurred at some time in the past. And it's the same kind of facts as In Remarriage of Tool, where I believe in Tool she showed up to trial and said, I moved out of my boyfriend's house. I got an apartment, so therefore I'm no longer cohabitating. And so to conclude, Your Honor, or Your Honors, if this case doesn't rise to the level of cohabitation, then the inequity the legislature sought to avoid will become a reality. So for the foregoing reasons, Mr. Moore requests that this court reverse the trial court's decision and to find that Marguerita Moore was cohabitating with another person on a resident-continuing conjugal basis. Thank you. Thank you. I'll be assuring recess. Are there cases under the law?